**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**


ROBERT F. MORALES                                                              PLAINTIFF

V.                                                                          **CASE NO. 3:12-CV-400-H**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY                           DEFENDANT


### FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION

Robert Morales filed this action pursuant to 42 U.S.C. §405(g), seeking judicial review of

an administrative decision of the Commissioner of Social Security, who denied his application

for supplemental security income benefits. Mr. Morales asserts that the administrative law judge

("ALJ") erred by failing to deem his post-traumatic stress disorder a severe impairment and by

rejecting the opinion of his treating psychiatrist.

After reviewing the parties' fact and law summaries (docket nos. 10 and 11) and the

administrative record (docket no. 8), the magistrate judge concludes that the ALJ's decision is

generally supported by substantial evidence in the record, except his analysis of the degree to

which Mr. Morales's ability to adapt to respond appropriately to changes in the work setting.

## I.  BACKGROUND

### A.  Procedural History

Mr. Morales filed an application for supplemental security income benefits in October

2009 and alleged that she became disabled as a result of an ankle injury and mental

impairments.[1] The ALJ determined that Mr. Morales's ankle injury, bipolar disorder, and

psychotic disorder are severe impairments, but concluded Mr. Morales is not disabled because he

---

[1] Admin. R. at 185-93,198.

retains the residual functional capacity to perform light work with certain exertional and non-exertional restrictions.[2] Mr. Morales petitioned the Appeals Council, which upheld the decision of the ALJ.[3] Mr. Morales then timely appealed to this court.

On appeal, Mr. Morales does not challenge the ALJ's determinations with respect to his physical impairments. He limits his appeal to the ALJ's conclusions with respect to the effect of his mental impairments on his ability to work.[4] Mr. Morales generally asserts that the ALJ erred by failing to consider the entire record and improperly relied on only the evidence that supported his own analysis of Mr. Morales's condition. Specifically, Mr. Morales asserts that the ALJ erred by: (1) giving greater weight to the opinions of two record-reviewing consultants than the opinions of the examining consultants and (2) by improperly relying Mr. Morales's lack of treatment to support his conclusion that Mr. Morales's mental illness was not as severe as the consultative examiners suggested.[5]

### B. The Five-Step Evaluation Process

In reaching a determination regarding a claimant's disability, an ALJ is required to perform a five-step sequential evaluation process. If the ALJ is able to find that a claimant either is or is not disabled at a particular step, he must not go on to the next step. The five steps are as follows:[6]

(1) Step one: the ALJ evaluates the claimant's work activity, if any. If the claimant is engaged in substantial gainful activity, he is not disabled.

(2) Step two: the ALJ considers the medical severity of the claimant's impairments. If there exists no severe medically determinable physical or mental impairment (or combination of impairments) that meets the duration requirement, the claimant is not disabled.

---

[2] *See generally* Admin. R. at 73-78.
[3] Admin. R. at 1-, 21-24.
[4] *See generally* Pl's Fact and Law Summ. (docket no. 10).
[5] *Id.*
[6] 20 C.F.R. § 404.1520(a)(4).

(3) Step three:  the ALJ also considers whether the claimant has an impairment (or combination of impairments) that meets or equals one listed in 20 C.F.R. Pt. 404, Subpt. P, App 1, and meets the duration requirement.  If so, the ALJ must find that the claimant is disabled.

Before the ALJ goes from step three to step four, he must assess the claimant's residual functional capacity, which the ALJ then must use at both step four and step five when evaluating the claimant's alleged disability.

(4) Step four:  the ALJ must consider his assessment of the claimant's residual functional capacity and his past relevant work. If the claimant can still do his past relevant work, the ALJ must find that he is not disabled.

(5) Step five:  the ALJ must consider the claimant's residual functional capacity and his age, education, and work experience to see if the claimant can make an adjustment to other work. A claimant who can make an adjustment to other work is not disabled, but one who cannot is disabled.

## II. STANDARDS OF REVIEW

In reviewing the ALJ's decision to deny disability benefits, the Court may not try the case *de novo,* nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994). Instead, judicial review of the ALJ's decision is limited to an inquiry into whether the ALJ's findings were supported by substantial evidence, *see* 42 U.S.C. § 405(g), *Foster v. Comm'r of Soc. Sec.,* 279 F.3d 348, 353 (6th Cir.2001), and whether the ALJ employed the proper legal standards in reaching his conclusion.  *Landsaw v. Sec'y of Health and Human Servs.,* 803 F.2d 211, 213 (6th Cir.1986).

## III. FINDINGS OF FACT

For the court's convenience,  a redacted copy of the ALJ's opinion, with those portions not pertaining to his discussion of his mental impairments excised, is appended hereto as Attachment A.

The ALJ determined that Mr. Morales has the residual functional capacity to perform light work, with certain exertional limitations, and that he can understand, remember, and carry out simple instructions in two-hour segments, and he can tolerate occasional interaction with supervisors and coworkers but should have no contact with the general public.[7] The ALJ conducted a thorough review of the evidence and cited specific documents or testimony that supported his conclusion, but his summary of his reasoning was:

> …[The] claimant's reported mental limitations are rather extreme and are not consistent with the record as a whole. He reports many years of symptoms but has made relatively little effort to seek treatment, which suggests that he is able to function adequately to perform most daily activities despite his impairments.[8]

Mr. Morales argues that the disabling effects of his mental health problems are indeed consistent with the record as a whole, and asserts that the ALJ erred not only in making this statement, but in giving undue weight to the opinions of the two record-reviewing consultants, whose reports were based on incomplete information.[9] Mr. Morales asserts that the ALJ should have relied instead on the opinions of the consultative examiners, who had the opportunity to interview, observe and test him.

### A. The Evidence Pertaining to Mr. Morales's Mental Health

Mr. Morales's evidence pertaining to his mental health diagnoses, status, and attempted treatment is not voluminous. Nevertheless, he testified about his symptoms at his hearing, and the record contains some documentation of a recent attempt to obtain treatment, plus the reports

---

[7] Admin. R. at 75.
[8] Admin. R. at 77.
[9] The record-reviewing consultants both submitted their reports several months before the hearing. *See* Admin. R. at 264-81 (prepared eighteen months before the hearing), 282-99 (prepared fourteen months before the hearing). Accordingly, they did not review the detailed report of the consultative examination performed at the ALJ's request after the hearing, and did not review the records of Mr. Morales's visits to Seven Counties, which began a few months after the last record-reviewing examiner's report. *See* Admin. R. at 308-19.

of two consultative examinations and of two state-agency record reviewers. The magistrate judge will discuss the relevant portions of each below.

*Mr. Morales's Testimony and Application Documents*

At the administrative hearing, Mr. Morales testified that he is unable to sustain any employment because of persistent distractibility, specifically from his daily struggle with hearing the voices of demons in his head.[10] He testified: "They belittle me. Just try to keep me from completing a task. They try to keep me from being the man that God wants me to be. They try to steer me away from the word of God, try to get me to do things that I know are morally wrong."[11] Mr. Morales also testified he talks back to the demon voices, which embarrasses him, and that he becomes chronically sleep-deprived when his is in a manic phase of his bipolar disorder, which affects his ability to interact appropriately with other people.[12] Nevertheless, he stated that he plays guitar at Moore Grace Ministries four days a week, and is a part of their music ministry program.[13] He did not, however, clarify whether he was being ministered to, or whether he was playing as part of an effort to minister to others.

Mr. Morales told both of the consultative examiners that he had been institutionalized at Bellevue Hospital in New York in the 1970s, but there is no documentation of this stay in the administrative record,[14] and there are scant records that Mr. Morales has received any other mental health treatment.

In his application documents, Mr. Morales stated that he is adaptable to changes in routine, can complete tasks most of the time, and stopped work only because of his broken

---

[10] Admion. R. at 39, 48-49, 54-58.
[11] Admin. R. at 56.
[12] Admin. R. at 56-57.
[13] Admin. R. at 43-44.
[14] Admin. R. at 258, 343.

ankle[15] but also noted that he does not handle stress well and has bipolar tendencies.[16] His mother reported that he does not handle stress well and suffers from auditory hallucinations and nightmares.[17]

*Mr. Morales's Treatment Records*

Mr. Morales has no significant history of being treated by a mental health professional. Other than consultative mental health examiners, there exist only the records of two visits to Seven Counties.[18] The first is an intake and diagnosis summary prepared by Becky House, a Licensed Clinical Social Worker. Her notes indicate that Mr. Morales came for treatment of his own volition, because he was suffering from auditory hallucinations, concentration problems, anger management issues, mood swings, and sleep deprivation. [19] Ms. House also noted:

> …Clt is very friendly and talkative. Clt used to be active in church and played guitar but has recently withdrawn. Clt does not 'do a whole heck of a lot.' Clt is easily irritated and does not like to be around people. Clt is hearing voices and is talking back to them so he does not want to be around people and embarrass himself.[20]

Ms. House diagnosed Mr. Morales as having bipolar disorder with severe depression and psychosis, and assigned him a GAF score of 36.[21] She also devised and recommended a treatment plan of both pharmaceutical and behavioral therapy. Both the diagnosis and treatment plan were reviewed and approved by Dr. Larry Meyers, M.D., a staff psychiatrist at Seven Counties.[22] Although Mr. Morales agreed to the plan, there exist no records that he obtained the suggested medicines or participated in the behavioral therapy.[23] He testified that he could not

---

[15] Admin. R. at 192, 196, 198.
[16] Admin. R. at 191-92.
[17] Admin. R. at 175-82.
[18] Admin. R. at 309-16.
[19] Admin. R. at 311.
[20] Admin. R. at 312.
[21] Admin. R. at 315-16.
[22] Admin. R. at 310.
[23] Admin. R. at 309-10.

continue with his treatment at Seven Counties because he no longer lived nearby and was not able to travel to his appointments. Mr. Morales was, however, homeless and slept in whatever abandoned building was available to him.[24] Nevertheless, he did not explain why he has made no other attempt to seek treatment recently.s

*The Opinions of the Consultative Examiners*

Mr. Morales underwent two consultative examinations by psychologists. The first took place approximately eighteen months before his hearing and the second, which was ordered by the ALJ, took place not long after his hearing.

Richard Klem, Ph.D., conducted the first examination in March 2010.[25] He diagnosed Mr. Morales as suffering from bipolar and psychotic disorders.[26] With respect to Mr. Morales's ability to work, Dr. Klem stated:

> He is not receiving outpatient counseling or medications for emotional conditions. His current condition appears to be stable. His prognosis appears to be guarded to fair. …[27]
>
> …based on the objective clinical findings and relevant claimant history as indicated in the above report, the claimant's current capabilities to do basic work activities can be noted to include the following: The claimant indicated the capability to take care of his grooming and hygiene needs, do laundry, do shopping, prepare meals, do various household chores as well as using the telephone, postal services, and being responsible for money management. His ability to understand and retain simple one- or two-step instructions and work-like procedures appears to be good. …[28]
>
> …His ability for sustained concentration and persistence to complete tasks in a timely fashion is likely varied, ranging from poor to fair or good. He did persist appropriately in this evaluation. His ability for social interactions is likely fair to good with certain family members and friends. The claimant indicated

[24] Admin. R. at 41-42, 101.
[25] Admin. R. at 255-63.
[26] Admin. R. at 261-62.
[27] Admin. R. at 262.
[28] Admin. R. at 262.

having some difficulty with social interactions. When under notable stress, the claimant can be expected to withdraw.[29]

Dr. Klem ultimately concluded that Mr. Morales's "current GAF appears to be 40-45" and his "ability to adapt to pressures and changes normally found in a day-to-day work setting are likely poor to fair at this time."[30]

Wayne Herner, Psy.D., conducted a post-hearing examination in October 2010.[31] Dr. Werner administered a battery of test, including an IQ test, the Minnesota Multi-phasic Inventory, and a test to detect malingering.[32] The results of the Weschler Adult Intelligence Scale test indicated that Mr. Morales had "[a]verage cognitive resources per WAIS-IV[, with] no deficits with reasoning [or] decision-making,"[33] and Dr. Herner remarked that the "test results indicate that he is a strong reader and average in arithmetic."[34] Dr. Herner also noted that "[p]ersonality testing indicated concerns with severe long term psychological problems,"[35] and, with respect to the MMPI-II, stated:

The results indicate a valid profile. Similar patterns of answers indicate a person who is endorsing a significant amount of emotional and psychological distress. His profile indicates a person that is typically not involved with other people. They are seen as suspicious and distrustful of others, avoiding deep emotional ties and seeming deficient in social skills. Inferiority, insecurity, and low self- confidence are typical of this profile (6-8). Individuals with similar profiles resent having demands placed upon them and can be quite moody, irritable and unfriendly. Psychotic behavior may be present. Poor judgment, severe confusion, delusions of grandeur/persecution, and excessive daydreaming is typical. Under times of stress these individuals tend to regress. Affect is typically blunted: attention deficits, and

[29] Admin. R. at 263.
[30] Admin. R. at 262-63.
[31] Admin. R. at 342-350.
[32] Admin. R. at 342.
[33] Admin. R. at 348.
[34] Admin. R. at 346.
[35] Admin. R. at347.

> memory issues are likely. Thinking can be fragmented, tangential, or bizarre.[36]

Nevertheless, Dr. Werner concluded that Mr. Morales had only mild limitations in his ability to make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with the public and stated that Mr. Morales had no more than moderate limitations in his ability to interact appropriately with his supervisors and respond appropriately with co-workers.[37] Dr. Herner noted, however, that Mr. Morales had "[p]roblems with concentration, ruminations, decision-making, [and] judgment," with moderate to marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting, depending on whether he was in a manic or depressed phase.[38]

The ALJ gave each of these reports only limited weight. To the extent the examining consultants' opinions varied from the conclusions of the record-reviewing consultants, the ALJ disregarded them.[39]

### The Opinions of the Record-Reviewing Consultants

The two state-agency consultants, Jan Jacobson, Ph.D., and Ann Demaree, Ph.D., stated that the evidence of record indicated that Mr. Morales's mental impairments caused no more than a moderate impairment of his ability to work.[40] The evidence of record at the time the consultants reviewed it, was extremely limited. Because these reports were prepared over a year before Mr. Morales's hearing, the consultants did not review the records of Mr. Morales's attempt to obtain treatment at Seven Counties, or the report of the second consultative

---

[36] Admin. R. at 346.
[37] Admin. R. at 348-49.
[38] Admin. R. at 349.
[39] Admin. R. at 78.
[40] Admin. R. at 264-99.

examination.  Their review was therefore limited entirely to Mr. Morales's application documents and the report of the first consultative examination.

The conclusions of each of the record-reviewing consultants were identical.  Both reviewers stated that Mr. Morales is moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact with the general public, and to respond appropriately to changes in the work setting.[41]  They agreed that Mr. Morales is able to understand and remember simple instructions, to sustain attention for simple tasks for extended periods of two-hour tasks, to tolerate his coworkers and supervisors in a setting with only occasional and casual public contact, and to adapt to changes as needed.  The ALJ gave these opinions the greatest weight.

### B.        The Testimony of the Vocational Expert

The vocational expert testified that there were jobs in the national and local economy Mr. Morales could perform.[42]  Her testimony, however, was premised on a set of presumptions contained in a hypothetical question posed by the ALJ.  Those presumptions assumed that Mr. Morales's mental health limitations were as assessed by the record-reviewing consultants. The ALJ asked the vocational expert to:

> Assume that you have an individual who can understand, remember, carryout someone's instructions. And can sustain attention for simple task completion of two-hour segments throughout an eight-hour day.  Could tolerate coworkers and supervisors where there's only occasional, casual contact. Probably best to avoid contact with the general public. And adapt to changes in work conditions in work conditions and the work itself with those parameters."[43]

---

[41] Admin. R. at 278-80, 296-98.
[42] Admin. R. at 59-65.
[43] *See* Admin. R. at 59-60.

The vocational expert replied that, even with Mr. Morales's additional physical limitations, he could work as a housekeeper, a laundry worker, a baker helper, a general clerk, or a "light hand packager."[44]

When the ALJ modified his hypothetical to account for Mr. Morales's complaints of significantly diminished concentration by asking "if there would be a problem where there would be breaks in the ability to maintain pace or attention to the work during the course of a day," however, the vocational expert responded: "If a person were unable to sustain concentration, persistence, and pace for two-hours blocks on a regular basis, competitive employment would be precluded."[45]

In reference to Dr. Klem's opinion that Mr. Morales's "ability for sustained concentration to complete tasks in a timely fashion is likely varied, ranging from poor to fair to good," Mr. Morales's attorney asked:

> ATTY:  Okay.  For our purposes here, the definition of the word "poor" would be limited to no ability, functional ability, okay, Ms. Franklin?
>
> VE:  Yes, sir.
>
> ATTY:  All right.  If a person's ability to sustain concentration and pace were poor to fair, would there be any jobs available for that person?
>
> VE.  Not in my opinion, sir.
>
> ATTY:  Okay.  If their ability to adapt to pressures and changes normally found in a day-to-day work settling were poor to fair, would there be any jobs for that person?
>
> VE.  Not in my opinion, sir.

---

[44] Admin. R. at 60-63.
[45] Admin. R. at 63.

At the ALJ's prompting, Mr. Morales's attorney clarified that "poor" did not mean that the person consistently had "no ability" to perform the specified task, but might occasionally, in the same sense the ALJ meant when he previously referred to "breaks in ability."[46]

## IV. ANALYSIS

The central factual issues in this case are whether the record supports the ALJ's conclusions that Mr. Morales retains adequate abilities to (1) sustain his concentration, persistence and pace for two-hour blocks during an eight-hour workday, and (2) adapt to typical pressures and changes that occur in the workplace, because the vocational expert testified that there were no jobs available for a person with "poor to fair" abilities in either area. Each of the consultants who examined and tested Mr. Morales opined that Mr. Morales had "poor to fair" abilities in at least one of those areas.[47] The record-reviewers, whose scope of review was limited, said he did not.[48] The ALJ gave the greatest weight to the opinions of the record reviewers, because their opinions matched his own conclusions derived from observing Mr. Morales at the hearing and conducting an independent review of the documents.[49] The question for this court, therefore, is whether it was proper for the ALJ to do so.

### A. Whether the ALJ Erred by Giving Greater Weight to the Opinions of the Record-Reviewing Consultants than Those of the Consultative Examiners

The rules pertaining to an ALJ's treatment of medical opinions (including the opinions of mental health professionals) are set forth in 20 C.F.R. §404.1527. There are three sources of medical opinion evidence upon which an ALJ can base his conclusions, opinions from: treating professionals (*e.g.*, psychiatrists or medical doctors), examining consultants, and non-examining (*i.e.*, record-reviewing) consultants. Pursuant to the treating physician rule, "the administrative

---

[46] Admin. R. at 65.
[47] Admin. R. at 64-65.
[48] Admin. R. at 278-80, 296-98.
[49] Admin. R. at 74-78.

law judge 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record.'" *Cole v. Comm'r of Soc. Sec.,* 661 F.3d 931, 937 (6th Cir. 2011)(citing 20 C.F.R. §404.1527(d)(2)). With respect to the other sources of opinion evidence, the regulations suggest a preference for the opinions of examining versus non-examining sources, *see* § 404.1527(d)(1), but if there exists no opinion of a treating professional that warrants controlling weight, the ALJ is free to determine what weight to give which of the other opinions, so long as his decision is supported adequately by the other evidence in the record. *See* 20 C.F.R. § 404.1527(d)(1)-(6).

There exists no evidence in the record that Mr. Morales has ever received meaningful, much less recent, treatment. Accordingly, Mr. Morales had no treating physician. The psychological evaluation and treatment plan created in September 2010 at Seven Counties was prepared by a licensed clinical social worker ("LCSW"). Although both were reviewed and approved by a staff psychiatrist, Dr. Larry Myers, Mr. Morales was unable to keep his appointments, so the treatment plan was never realized. This does not constitute a treating physician relationship. *See* 20 C.F.R. § 404.1502.

Because there existed no opinion from a treating physician, the ALJ evaluated the various consultants' opinions and gave the most weight to the opinions of the record-reviewing consultants, whose findings he determined were best supported by the other evidence in the record. The ALJ discussed, in detail and with numerous citations to the record, why he considered the non-examining consultants' opinions to be the most supported by the evidence.

With respect to the issue of Mr. Morales's impaired ability to sustain concentration, persistence, or pace, three of the four consultants agree that it is no more than moderately

impaired.  Dr. Herner, who examined Mr. Morales most recently, and subjected him to a battery of tests that required sustained concentration, noted that Mr. Morales's had problems with concentration, but his answers to specific questions on his Medical Source Statement indicated that the impairment was no more than mild.  Although the results of the MMPI-II indicated that others whose results were similar to Mr. Morales's often have attention deficits and memory issues, Dr. Herner's observations of Mr. Morales during the testing and evaluation revealed "no significant attention problems" at the time.  Accordingly, the magistrate judge concludes that the ALJ did not err when he gave greater weight to the non-examining consultants' conclusions about this issue.

The magistrate judge cannot say the same for the question of whether Mr. Morales has sufficient ability to respond appropriately to usual work situations and to changes in a routine work setting.  The record-reviewers deemed this problem to be no more than moderate, and the ALJ agreed.  The consultants deemed significant Mr. Morales's failure to list any of the symptoms of his mental illness (*e.g.,* hearing voices, anger) on the so-called "3368 form" that requested information about which of his symptoms affect his ability to work.  They also deemed significant the fact that the field office noted no mental limitations in Mr. Morales's teleclaim, and the fact that Mr. Morales told Dr. Klem that he had no problems either with his productivity at work or his ability to get along with his coworkers and supervisors. [50]  All of these statements are accurate representations of the record, but the consultants did not mention, or explain the inconsistency with, Dr. Klem's ultimate conclusion that Mr. Morales's "ability to adapt to pressures and changes normally found in a day-to-day work setting are likely poor to fair at this time."

---

[50] *See* Admin. R. at 280 (Jacobson report); 294 (Demaree report, adopting Jacobson's analysis).

In addition, the consultants prepared their reports well over a year before Mr. Morales sought treatment at Seven Counties and was examined by Dr. Herner. Dr. Klem's assessment of Mr. Morales's abilities in this area was "poor to fair at this time" – he did not use the term "marked," which is specified in the regulations. Accordingly, the consultants were at least facially correct when they stated that Dr. Klem's report indicated no marked limitations. Nevertheless, the record-reviewing consultants had no opportunity to review the most recent medical evidence when they formulated their opinions. That evidence included Dr. Herner's report and the Seven Counties records.

In addition to being more recent in time by almost eighteen months, Dr. Herner's report was more detailed and greater in scope than Dr. Klem's, because it included the results of a battery of standardized testing and a specific functional capacity assessment. In that assessment, Dr. Herner concluded that Mr. Morales's had a moderate to marked impairment of his ability to adapt to usual work settings and changes in routine. This conclusion is supported by the Seven Counties records, which are admittedly not dispositive because of Mr. Morales's minimal contact with the facility. Nevertheless, the magistrate judge cannot conclude that the record-reviewing consultants would not have found the additional evaluation and records significant, or reached a different conclusion, had they been given the opportunity to review them.

In addition, the magistrate judge concludes that the ALJ's reasons for rejecting Dr. Herner's assessment with of Mr. Morales's adaptability are not supported by the record. The ALJ dismissed Dr. Herner's assessment of "moderate to marked impairment" because it was "variable." But, the vocational expert testified that variability of an impairment was not preclusive, only the endpoints of the range. She stated that a person with a "poor to fair" ability to adapt to pressures and changes normally found in a day-to-day work settling would not be able

to work.  It therefore appears that the ALJ erred in failing to give the examining sources'
opinions greater weight than those of the record reviewers.  *See* 20 C.F.R. §
1527(c)(1)("Generally we give more weight to the opinion of a source who has examined you
than to the opinion of a source who has not examined you."); § 404.1527(c)(3)("We will
evaluate the degree to which these opinions consider all of the pertinent evidence in your claim
…"); and § 404.1527(c)(4)("Generally the more consistent an opinion is with the record as a
whole, the more weight we will give that opinion.").

## V. CONCLUSION

For the reasons stated herein the magistrate judge concludes that the district court should
remand the decision of the Commissioner of Social Security for further consideration of the
narrow issue of the degree to which Mr. Morales's ability to adapt to pressures and changes
normally found in a day-to-day work setting is impaired.

**DATE:**


Copies to:  counsel of record


## NOTICE

Within fourteen (14) days after being served a copy of these proposed findings of fact,
conclusions of law, and recommendation, any party who wishes to object must file and serve
written objections, or further appeal is waived.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  A
party may file a response to another party's objections within fourteen (14) days after being
served with a copy thereof.  Fed. R. Civ. P. 72(b).

**Portions of the Administrative Law Judge's Opinion
that Pertain to Mr. Morales's Mental Health**

**2.  The claimant has the following severe impairments: bipolar  disorder, psychotic disorder, and history of left ankle fractures with open reduction and internal fixation (20 CFR 416.920(c)).**

The record reflects that the above-named impairments have each been diagnosed by a doctor or licensed psychologist and that each has a significant effect on the claimant's ability to perform basic work activities, as discussed more fully below.  Thus, they constitute severe medically determinable impairments.  …

**3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part  404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

…The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction.  He does not sleep well and sometimes needs reminders to do chores or maintain his personal hygiene.  He is able to tend to his own personal care, prepare meals, shop for groceries, do laundry and household chores, use public transportation, play music, use a telephone and postal services, and manage finances.  (Ex. 3E, 4E, 5F).

In social functioning, the claimant has moderate difficulties.  He is described as pleasant and friendly (Ex. 11F, 16F), but he says that he avoids people because he is afraid that he will embarrass himself by responding to his auditory hallucinations (Ex. 11F).  He has reported that he has anger outbursts and tends to lash out at people when under stress.  He says that he yells at others and slams doors during these outbursts but does not physically hurt people. (Ex. 11F).  He has been terminated from past employment for difficulty getting along with others (Ex. 3E, 4E).  Despite these limitations, he is able to maintain some positive social relationships.  He has friends and is in a band (Ex. 16F).  He is active in his church (Ex. 4E) and testified that he attends religious services four times a week.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. He says that he hears voices and has difficulty concentrating on anything, but he has reported that he is able to complete tasks most of the time. He says that he can follow written instructions, though he sometimes struggles with spoken instructions. He reports poor stress tolerance but describes himself as adaptable to changes in routine. (Ex. 4E). He has not been diagnosed with an attention deficit disorder and was able to maintain appropriate attention throughout his consultative psychological evaluations (Ex. SF, 16F).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation of extended duration. The record reflects no inpatient psychiatric hospitalizations or other extended episodes of significantly diminished adaptive functioning.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant has not had repeated episodes of decompensation, each of extended duration, he has not established that he has such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate, and he has not proven incapable of living outside of a highly supportive living environment. Furthermore, the "paragraph C" criterion of Medical Listing 12.06 is not satisfied because the claimant has not demonstrated a complete inability to function outside the area of his home.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he can only occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds; he must avoid unprotected heights; and he must have the option to sit or stand throughout the workday.  He can understand, remember, and carry out simple instructions in two-hour segments, and he can tolerate occasional interaction with supervisors and coworkers but should have no contact with the general public.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment

than can be shown by the objective medical evidence alone, 20 CFR 416.929(c) describes the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p). The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

…He also reports a longstanding inability to maintain full-time employment due to his mental impairments. Despite reporting severe symptoms such as auditory hallucinations and poor concentration, he has had very little mental health treatment. He says that he was unable to follow up after his initial psychiatric evaluation due to transportation difficulties, but that he intends to seek treatment through another provider. He reports that he hears voices frequently and has difficulty focusing on anything for more than brief periods. He says that he has mood swings, does not tolerate stress well, and sometimes lashes out at others.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

…[The] claimant's reported mental limitations are rather extreme and are not consistent with the record as a whole. He reports many years of symptoms but has made relatively little effort to seek treatment, which suggests that he is able to function adequately to perform most daily activities despite his impairments. He went through the intake process with a mental health

clinic in September 2010 but discontinued treatment after one or two visits. He says that he was unable to continue at that location due to a lack of transportation, but he is able to use public transportation (Ex. 4E) and gives no explanation for his lengthy delay in seeking an alternative provider. Even without treatment, the evidence does not support the degree of limitation that the claimant has described. He testified that his sporadic work history is largely attributable to his inability to focus, and he says that he cannot concentrate on anything for more than a few minutes. However, he has reported that he is generally able to complete tasks and can perform activities requiring attention and concentration such as studying his Bible, watching television, playing music, and attending church services (Ex. 4E). A third party reported that the claimant spends most of his day watching television (Ex. 3E), and he has admitted that he can watch television or play the guitar for two or three hours at a time (Ex. 5F). Both consulting psychologists noted that the claimant maintained adequate attention throughout their evaluations (Ex. 5F, 16F), and there is no indication that the claimant has been diagnosed with an attention deficit disorder. Thus, the evidence is consistent with the reviewers' statements finding the claimant capable of sustaining adequate attention and concentration to perform simple tasks in two-hour segments (Ex. 7F, 9F). The claimant also has mood swings and tends to lash out at others by yelling and slamming doors during times of stress (Ex. 11F), but his activities demonstrate that he is capable of engaging in limited social interaction. He attends religious services four times a week, and he is in a band, has friends, and plays the guitar at church (Ex. 16F). He can perform routine activities in public, such as shopping and attending medical appointments (Ex. 3E, 4E). He was polite and cooperative during his psychological evaluations, and he presented with a euthymic mood and pleasant demeanor (Ex. 16F). A social worker described him as "friendly and talkative" (Ex. 11F). He related well to the Administrative Law Judge and to his representative during the hearing, and he exhibited no obvious signs of inattention, distractibility, or emotional distress.

As for the opinion evidence, both state agency reviewers felt that the claimant could tolerate social interaction in a workplace with only casual public contact (Ex. 7F, 9F). These opinions are consistent with the other evidence of record and are given great weight, though the undersigned has adopted somewhat more restrictive social limitations in order to account for the claimant's heightened irritability during periods of stress. The opinions of the consulting psychologists (Ex. 5F, 16F) are given weight only to the extent that they are consistent with the residual functional capacity described above. Dr. Klem noted problems with variable concentration and adaptability (Ex. 5F), and Dr. Herner noted variability in the claimant's ability to respond to usual work situations and workplace changes (Ex. 16F). However, as discussed in finding number three, the undersigned has determined that the record as a whole establishes only moderate impairments in these areas of functioning. In light of the claimant's previous report that he is adaptable and can complete tasks most of the time (Ex. 4E); his good attention and concentration during his psychological evaluations (Ex. 5F, 16F); and his ability to perform a wide range of activities of daily living, including watching television and playing guitar for up to three hours at a time (Ex. 5F); the undersigned is persuaded that the residual functional capacity described above adequately addresses his limitations. The undersigned gives little weight to the psychological evaluation performed in September 2010 (Ex. 11F). It was performed by a social worker, not a licensed psychologist. The social worker had no established treatment relationship with the claimant, and her evaluation appears to be based almost entirely on the claimant's subjective complaints. It includes no psychometric testing and no mental status examination

involving objective criteria (the "mental status" portion of the evaluation mentions only the claimant's self-reported symptoms).  Consequently, the undersigned finds the social worker's opinion unpersuasive.

Additionally, though the consultants' opinions have been given limited weight, the undersigned believes it necessary to address the claimant's objection to his most recent psychological evaluation (Ex. 16F).  The claimant argues that this assessment is incomplete because Dr. Herner lists certain problem areas (concentration, rumination, decision making, and judgment) without assigning a specific degree of limitation to those areas (Ex. 13E).  The claimant's capacity for decision making and judgment are specifically addressed on the first page of the medical source statement form to which the claimant refers; his limitations in these areas are characterized as mild (Ex. 16F).  Moreover, Dr. Herner submitted a thorough psychological evaluation that included the claimant's self-reported history and subjective complaints, Dr. Herner's own observations of the claimant's behavior during the evaluation, and psychometric testing with detailed interpretation of the claimant's results.  The claimant's concentration and other "problem areas" are discussed in the evaluation, and the undersigned does not consider that evaluation to be incomplete merely because Dr. Herner failed to assign a subjective label of "mild," "moderate," "marked," or "extreme" in all areas mentioned in the form that accompanied it.  The record contains sufficient evidence to determine the claimant's residual functional capacity without requesting further information from the psychological consultant.

In sum, the above residual functional capacity assessment is supported by … the opinion evidence indicating that he can perform a limited range of light work; his ability to perform a relatively wide range of activities of daily living despite his impairments; his failure to comply with mental health treatment; the opinions of the reviewing psychologists regarding his mental limitations; and the other evidence discussed above.